IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

K.C. b/n/f M.C. and W.C.        §
                               §
VS.                            §        CIVIL NO. 4:08-CV-100-Y
                               §
MANSFIELD INDEPENDENT SCHOOL    §
DISTRICT                       §

ORDER DENYING APPELLANTS' MOTION
FOR JUDGMENT AND GRANTING JUDGMENT IN FAVOR OF APPELLEE

        Pending before the Court is Appellants' Motion for Judgment on

the Administrative Record (doc. #21).  After review of the motion

and the school district's response, the Court concludes that Appel-

lants have not met their burden in establishing that their daughter

was not provided a free appropriate public education as required by

the Individuals with Disabilities Education Act.  As a result, the

motion will be denied and judgment will be entered for the appellee

school district.


I.  Background

        This is an appeal from the decision of a Texas Education Agency

special education hearing officer in *K.C. b/n/f M.C. and W.C. v.*

*Mansfield Independent School District,* Docket No. 221-SE-0407.

Under the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400 *et seq.*, the parents of a disabled child may present

a complaint "with respect to any matter relating to the identifica-

tion, evaluation, or educational placement of the child, or the

provision of a free appropriate public education to such child."

20 U.S.C. § 1415(b)(6).  The parents of K.C. ("Appellants") filed

such a complaint, arguing that the Mansfield Independent School

District ("MISD") violated the IDEA.  Appellants were provided with a due-process hearing in accordance with § 1415.  After the hearing, the hearing officer issued an opinion denying the relief sought by Appellants.

Appellants' child, K.C., suffers from a genetic disorder known as Williams syndrome.  Williams syndrome typically results in some degree of mental retardation and related cognitive and learning difficulties.  (Rec. at 1589.)[1]  Those with Williams syndrome often express an interest in music and some research suggests that music may be used in the academic development of a child with the disorder.  (*Id.*)  Appellants' complaint is based on their contention that MISD has failed to provide K.C. with a free appropriate public education ("FAPE") by way of adequate "Individual Education Programs" ("IEP") in light of her condition as required by the IDEA.  An IEP, generally, is a plan to educate and provide services to a child covered by the IDEA, considering the child's abilities, needs, and interests.  *See* 20 U.S.C. § 1414(d).  Specifically, Appellants argue that adequate testing to assess K.C.'s skills and abilities was not done, that the IEPs developed by MISD were not individualized to K.C.'s skills and interests, and the programs meant to provide K.C. with the ability to transition into life after high school were insufficient.

---

[1] The record from the due-process hearing is in three volumes.  The first two are various documents submitted for consideration by Appellants and MISD.  These documents have been "Bates stamped" and are, therefore, cited as "Rec. at __."  The transcript of the actual hearing is separately numbered.  Citations to the transcript are indicated as "Trans. at __."

After becoming dissatisfied with the services provided by MISD, Appellants sought to have K.C. placed in the Berkshire Hills Music Academy ("BHMA"), a residential institution located in South Hadley, Massachusetts. Appellants argue that BHMA is the best choice for K.C. as it not only focuses on functional living skills, but also provides music education, something Appellants assert K.C. has shown interest in and talent for. After notifying MISD of K.C.'s enrollment, Appellants sought to be reimbursed for the costs of K.C.'s attending BHMA. An MISD Admission, Review, and Dismissal ("ARD") committee was sent to BHMA to evaluate its programs. The ARD committee concluded that MISD could provide K.C. with adequate services under amended IEPs and denied Appellants' request. After concluding that the new IEPs were still inadequate, Appellants sought relief under the IDEA by way of a hearing before a special education hearing officer. The officer's decision denying all of Appellants' requested relief was appealed to this Court pursuant to 20 U.S.C. § 1415(i)(2).

## II. Discussion

### A. Legal Standards

#### 1. Standard of Review

When reviewing a state officer's decision in a due-process hearing under IDEA, a district court must receive the administrative record and additional evidence at the request of any party. *See* 20 U.S.C. § 1415(e)(2). Per the Order Directing Case to be Treated as an Appeal (doc. #10) the parties had until August 11, 2008, to

request a hearing to present additional evidence.  No timely re-
quests were received.  As a result, the Court is left to decide this
case based solely on the administrative record.  *See Austin Indep.
Sch. Dist. v. Robert M.*, 168 F. Supp. 2d 635, 638 (W.D. Tex. 2001)
("Where no party has requested the court to hear additional evi-
dence, a motion for summary judgment is simply a procedural device
for asking the court to decide the case on the basis of the adminis-
trative record.").  Given this procedural posture--i.e., judgment
based on the administrative record must be entered either in favor
of Appellants or MISD, and given that MISD requests judgment be
entered in its favor in its brief, MISD's brief will be construed
as a motion for judgment.

This Court must make an independent decision in evaluating
whether Appellants have established by a preponderance of the
evidence that MISD did not provide K.C. with a FAPE.  *See Houston
Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000);
*see also Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th
Cir. 2003) ("The party contesting the propriety of the IEP bears the
burden of establishing why the IEP and the resulting placement are
inappropriate under the IDEA.").  The review of the state officer's
decision is "virtually de novo." *Houston Indep. Sch. Dist.*, 200
F.3d at 347.  Even so, "courts must be careful to avoid imposing
their view of preferable educational methods upon the State." *Bd.
of Ed. v. Rowley*, 458 U.S. 176, 207 (1982).  This is because histor-
ically, states and local authorities have had primary responsibility
for educating children at the elementary and secondary levels and

4

"courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *See Rowley*, 458 U.S. at 207-08 & n.30.   Consequently, a district court "must accord 'due weight' to the hearing officer's findings." *Houston Indep. Sch. Dist.*, 200 F.3d at 347.

        2.   IDEA

        Much of the parties' briefing focuses on how this case must be analyzed under the IDEA.   Appellants complain that the hearing officer erred in applying the standard announced in *Board of Education v. Rowley.*   In *Rowley* the United States Supreme Court set out a two-step analysis for claims brought under the IDEA's predecessor, the Education of the Handicapped Act (EHA).[2]   *See Rowley*, 458 U.S. at 206-07.   First, a court must determine whether the procedures set forth in the act have been complied with.   *Id.* at 206.   This entails an evaluation of whether the relevant State has adopted a plan and policies as required by the act and whether an IEP that conforms with the act has been developed.   *Id.* at 207 n.27.   Next, a court must determine whether the IEP is "reasonably calculated to enable the child to receive educational benefits."   *Id.* at 207.

        In developing this analysis, the Court explained:

        By passing the Act, Congress sought primarily to make
        public education available to handicapped children. But
        in seeking to provide such access to public education,
        Congress did not impose upon the States any greater
        substantive educational standard than would be necessary

---

        [2] In 1990 "Individuals with Disabilities Education Act" was substituted for "Education of the Handicapped Act" throughout Title 20.   *See* Act of Oct. 30, 1990, Pub. L. 101-476, 104 Stat. 1142.

> to make such access meaningful. Indeed, Congress ex-
> pressly [recognized] that in many instances the process
> of providing special education and related services to
> handicapped children is not guaranteed to produce any
> particular outcome. Thus, the intent of the Act was more
> to open the door of public education to handicapped
> children on appropriate terms than to guarantee any
> particular level of education once inside.

*Id.* at 192 (internal citations and quotations omitted, alteration in original).  "Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Id.* at 189.  Rather than require that equal opportunities be provided to handicapped children or impose a "basic floor of opportunity" for such children, the act's requirements of a FAPE and "specially designed instruction" simply require the provision of "such . . . support services . . . as may be required to assist a handicapped child *to benefit* from special education." *Id.* at 198-201 (emphasis in *Rowley*) (quoting then 20 U.S.C. § 1401(17)).

Appellants argue that this reasoning underlying the two-step analysis developed in *Rowley* is no longer valid when taken in light of the enactment of IDEA and the 1997 and 2004 amendments to the IDEA.  According to Appellants, since *Rowley,* and over the last twenty-five years, changes in the underlying statute establish a shift from the conclusion in *Rowley*--that all that must be provided to disabled children is access to a public education and some

benefit--to a requirement of more substantial opportunities and meaningful benefits.

Appellants argue that since the 1997 amendments to the IDEA the act has embodied "high expectations for [disabled] children." *See* 20 U.S.C. § 1400(c)(5)(A) (stating that the education of children with disabilities can be made more effective through high expectations). Appellants insist that it is "especially important" that since 1997 the IDEA has sought to prepare students for employment and independent living. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) (requiring that a child's IEP include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills"). Appellants argue that this case is largely based on MISD's failure to provide adequate "transition services" and that at the time *Rowley* was decided such services were not specifically contemplated by the EHA. Conversely, the IDEA defines "transition services" as a coordinated set of activities within a results-oriented process focused on improving the academic and functional achievement of the child to facilitate movement to post-school activities based on the individual child's needs, strengths, preferences, and interests and "includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional

vocational evaluation." 20 U.S.C. § 1401(34). Transition ser-
vices are part of the overall IEP. *See* 20 U.S.C.
§ 1414(d)(1)(A)(i)(VIII)(bb).

Along similar lines, Appellants argue that the analysis devel-
oped in *Rowley* is no longer applicable to IDEA cases because,
contrary to the Supreme Court's conclusion in *Rowley* that only
access with some benefit is required, the IDEA is now results-
oriented, requiring performance goals to be established for disabled
children that are consistent with the relevant jurisdiction's
standards for all children. *See* 20 U.S.C. § 1412(a)(15) (requiring
performance goals and indicators that promote the purposes of the
act and are consistent with other goals and standards for children
established by the state); *see also* 34 C.F.R. § 300.39(b)(3)(ii)
(stating that specially designed instruction means, inter alia,
"ensur[ing] access of the child to the general curriculum, so that
the child can meet the educational standards within the jurisdiction
of the public agency that apply to all children.").

To demonstrate the impact of these changes to the IDEA, Appel-
lants point to case of *J.L. Mercer Island School District.* In
*Mercer Island*, the United States District Court for the District of
Washington stated that the law regarding "disability education"
underwent a change in 1997. *See J.L. v. Mercer Island Sch. Dist.*,
No. C06-494P, 2006 U.S. Dist. LEXIS 89492, at *10 (D.C. Wash. Dec.
8, 2006). The court explained,

> Prior to that time, the statutory scheme was the Educa-
> tion for Handicapped Children Act of 1975 (EHA), the
> purpose of which was solely to provide access to educa-
> tion for disabled students who had been marginalized in
> the public school system.  Satisfied that the goal of
> "access" had been reached, in 1997 Congress enacted the
> IDEA with the express purpose of addressing implementa-
> tion problems resulting from "low expectations, and an
> insufficient focus on applying replicable research on
> proven methods of teaching and learning for children with
> disabilities." 20 U.S.C. § 1400(c)(4).  The statute
> clearly stated its commitment to "our national policy of
> ensuring equality of opportunity, full participation,
> *independent living, and economic self-sufficiency for
> individuals with disabilities*." 20 U.S.C. § 1400(c)(1)

*Mercer Island Sch. Dist.*, 2006 U.S. Dist. LEXIS 89492, at *10-11

(emphasis in *Mercer*).  The *Mercer Island* court opined that there had

been "a significant shift in focus from the disability education

system in place prior to 1997" in that "[t]he IDEA is not simply

about 'access;' it is focused on "transition services, . . . an

*outcome-oriented* process, which promotes movement from school to

post-school activities . . . taking into account the student's

preferences and interests." *Id.* at *11, *12 (emphasis in *Mercer*).

To the extent the Supreme Court in *Rowley* was dealing with a statute

that did not require transition services or review of IEPs to

determine if annual goals were being obtained, the district court

in *Mercer Island* concluded that *Rowley* had been "superseded by later

legislation." *See id.*

The United States Court of Appeals for the Fifth Circuit has,

however, continued to rely on *Rowley* subsequent to 1997. *See*, *e.g.*,

*Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346-7 (5th Cir.

9

2000).  And although the Fifth Circuit has apparently never ad-
dressed an argument that amendments to the IDEA have displaced the
*Rowley* standard, at least one court of appeals has addressed such
an argument.  In *L.T. v. Warwick School Committee*, the United States
Court of Appeals for the First Circuit was faced with an argument
based on the IDEA's language that teachers be trained to help
special needs children "meet . . ., to the maximum extent possible,
those challenging expectations that have been established for all
children' and prepare them to 'lead productive, independent, adult
lives, to the maximum extent possible." *L.T. v. Warwick Sch. Comm.*,
361 F.3d 80, 83 (1st Cir. 2004) (quoting 20 U.S.C. § 1400(c)(5)(E)).
The parents of a disabled child in *Warwick* argued that this language
displaced the *Rowley* standard of access with some benefit to a
requirement that schools provide the "maximum benefit" possible to
special needs children.  *Id.* (quoting 20 U.S.C. § 1400(c)(5)(E)).
This argument was rejected by the First Circuit, which noted that
courts of appeals had continued to apply *Rowley* despite the 1997
amendments to the IDEA because *Rowley* "recognizes that courts are
ill-equipped to second-guess reasonable choices that school dis-
tricts have made among appropriate instructional methods." *Id.*
Later, in *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, the First
Circuit specifically addressed the impact of the 1997 amendments in
light of the District of Washington's decision in *Mercer*.  The First
Circuit deemed *Mercer* not persuasive and unconvincing after stating

that neither the amendments nor other post-1997 case law required that the *Rowley* standard be discarded. *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 27-28 & n. 5 (1st Cir. 2008). Other courts have stated that had Congress intended to displace *Rowley* by its amendments to the IDEA it would have been much more explicit. *See Mr. and Mrs. C v. Me. Sch. Admin. Dist.*, 538 F. Supp. 2d 298, 300 (D. Me. 2008) (noting that *Rowley* has been prominent in IDEA cases for over twenty-five years, that Congress is presumed to be familiar with Supreme Court precedent and, there-fore, if Congress intended to supersede *Rowley* it would speak clearly); *see also San Refael Sch. Dist. v. Cal. Special Ed. Hearing Office*, 482 F. Supp. 2d 1152, 1165 (N.D. Calif. 2007) (concluding *Rowley* remains good law because Congress did not mention it in amending IDEA).

Relatedly, Appellants note that various courts, including the Fifth Circuit, have stated that "the educational benefit that an IEP is designed to achieve must be 'meaningful.'" *Houston Indep. Sch. Dist.* 200 F.3d at 347. But the use of the word "meaningful" does not demonstrate the shift in the standard applicable to an IDEA case that Appellants argue has occurred. Rather, courts have used "meaningful" in explicating the *Rowley* standard, not in attempting to alter it. *See*, *e.g.*, *id.* *Rowley* itself stated that access alone is not enough; instead States must "make such access meaningful." *Rowley*, 458 U.S. at 192; *see also Irving Indep. Sch. Dist. v. Tatro*,

468 U.S. 883, 891 (1984) (citing *Rowley* in stating that "Congress sought primarily to make public education available to handicapped children" and "to make such access meaningful."). Courts that have used the term "meaningful" in interpreting *Rowley* are simply acknowledging that the Supreme Court meant what it said--disabled children must receive a fair appropriate public education with some benefit. That is, a child's IEP must be likely to produce progress that is neither trivial or de minimis and certainly not produce regression. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997).

With the foregoing, the Court concludes that *Rowley* continues to provide the standard for deciding an action brought under the IDEA. Under the IDEA, a disabled child is to receive a free appropriate public education. *See Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003). In turn, "the FAPE must be tailored to the child's particular needs by means of an individual education program, which is a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *Id.* Under *Rowley*, as interpreted by the Fifth Circuit, an IEP

> need not be the best possible one, nor one that will
> maximize the child's educational potential; rather, it
> need only be an education that is specifically designed
> to meet the child's unique needs, supported by services
> that will permit him "to benefit" from the instruction.

12

> In other words, the IDEA guarantees only a "basic floor of opportunity" for every disabled child, consisting of "specialized instruction and related services which are individually designed to provide educational benefit." Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or de minimis; rather, an IEP must be "likely to produce progress, not regression or trivial educational advancement." In short, the educational benefit that an IEP is designed to achieve must be "meaningful."

*Houston Indep. Sch. Dist.*, 200 F.3d at 347.  In *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, the Fifth Circuit identified four factors to be considered when evaluating whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA.  They are:

> (1)  whether the program is individualized on the basis of the student's assessment and performance;
>
> (2)  whether the program is administered in the least restrictive environment;
>
> (3)  whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and
>
> (4)  whether positive academic and non-academic benefits are demonstrated.

*Cypress-Fairbanks*, 118 F.3d at 253.

B.  Analysis

Appellants did not argue before the hearing officer that MISD failed to comply with any of the IDEA's procedural aspects.  Nor do they make such an argument before this Court.  Thus, the Court turns to the second portion of the *Rowley* analysis--i.e., whether in light

13

of the four factors identified in *Cypress-Fairbanks,* MISD has implemented an IEP that is likely to meaningfully benefit K.C.

At the outset, the Court notes that the vast majority of Appellants' brief is dedicated to a factual statement and their arguments regarding the continuing validity of *Rowley*, leaving the Court without much guidance in applying the four *Cypress-Fairbanks* factors. In fact, the *Cypress-Fairbanks* factors are never even mentioned in Appellants' brief. Faced with MISD's persuasive arguments that the *Rowley* standard remains intact, the Appellants make arguments under the *Cypress-Fairbanks* factors in their reply. For example, Appellants argue that the IEPs developed by MISD after a May 2007 ARD committee meeting did not contain measurable functional goals designed to meet K.C.'s needs. (Appellants' Reply at 3 (citing 34 C.F.R. § 300.320(a)(2)(i)).) Later in their brief Appellants cite § 300.320(a) in arguing that the IEPs developed after a June 2007 ARD committee meeting were insufficient. (Appellants' Reply at 7-10.) But Appellants do not cite § 300.320(a) in their opening brief, let alone explain how it establishes that the IEPs that were developed after the May and June 2007 ARD committee meetings were insufficient. Arguments such as these, raised as they are for the first time in Appellants reply, will not be considered. *See Springs Industries, Inc., v. American Motorists Ins. Co.,* 137 F.R.D. 238, 239 (N.D. Tex. 1991).

Appellant's brief also provides an extensive factual statement. Throughout this statement Appellants complain of various acts and omissions committed by MISD.  But Appellants never refer to applicable legal principles, leaving the Court without any guidance in assessing the relevance of a twenty-page factual statement.  Thus, the Court is left to identifying relevant factual issues and seeking out the applicable legal principles in assessing such facts without the benefit of briefing.

In fact, a large portion of the factual statement is apparently meant to do no more than provide background and context. (See Appellants' Reply at p.2 (stating any facts presented that occurred prior to the limitations period are "for background purposes only"). For instance, Appellants state that in May 2004 an ARD committee meeting was conducted in which it was noted that K.C. "loves music." (Appellants' Brief at 2.)  In regard to transition services, it was noted that K.C. desired to continue with music or theater arts and that choir and theater arts courses were necessary.  (*Id.*)  Appellants complain that in spite of the foregoing, with respect to the needed vocational development, the career and technology education ("CATE") courses listed were child development, keyboarding, business computer information systems I, personal and family development, and introduction to food science. (*Id.* at 3.)  But Appellants never explain whether these are in fact the classes K.C. participated in the following school year or the significance of "CATE."

Further, as Appellants acknowledge, these facts precede the statute of limitations applicable to this case. Under the IDEA a parent must request a hearing within two years of the date the parent knew or should have known about the alleged actions that form the basis of the complaint. *See* 20 U.S.C. § 1415(f)(3)(C). A state may impose its own time limitation, *id.*, and Texas has done so with TEX. ADMIN. CODE. ANN. § 89.1151(c). Under that section a parent must request the hearing within one year of the date the parent knew or should have known of the alleged action that serves as the basis for the complaint. In this case, Appellants acknowledge section 89.1151(c) prevents the Court from considering any events prior to April 23, 2006.

1.   Was the program individualized on the basis of the student's assessment and performance?

Throughout Appellants' factual statement is the theme that the IEPs developed by MISD were not individualized to K.C. in that they did not sufficiently focus on her interest in music or account for her needs. Appellants complain that K.C.'s two experiences with choir through MISD were negative and insufficient to prepare K.C. to use her musical skills as a vocation. Appellants claim that in the 2004-2005 school year K.C. participated in choir at MISD but complain that the choir director was reluctant to have K.C. partici-pate for fear of jeopardizing the choir's performance in University

16

Interscholastic Activities ("UIL"), (Rec. at 764-68), and during a choir competition K.C. was "effectively totally excluded." (Appellants' Br. at 6 (citing Trans. at 181:8-186:19 and 186:22-25.)

After discontinuing her participation in choir at MISD and participating in other programs, K.C. again attempted to participate in a choir program through MISD, this time by being transported to participate in the choir program at Timberview High School.  At Timberview K.C. was expected to sight read music.  But those with Williams syndrome often suffer visual-spatial impairment and K.C. had difficulty sight reading. (Rec. at 360.)  K.C. received failing grades for each grading period during the semesters in which she participated in choir at Timberview, but passed the class each semester.  (Rec. at 863-66.)

In the interim between K.C.'s participation in choir at MISD and at Timberview, K.C. was placed in a "Ready, Set, Teach" program. (Trans. at 189-90; Rec. at 1004-10, 1631.)  As part of this program, K.C. was to assist a music teacher with kindergarten students. (*Id.*)  This program proved inappropriate for K.C. and she was removed from it.  (Trans. at 190-91, 199-204, 673-74, Rec. at 1010.)

During an ARD committee meeting begun in September 2006 and reconvened in October 2006, a document indicated that K.C. had "passed exit evaluations." (Rec. at 705.)  Appellants insist that there is no evidence that tests K.C. had previously taken were to be considered exit evaluations. Also, Appellants presented "Prelim-

17

inary Family Input" at this ARD meeting regarding transition ser-vices for K.C. (Rec. at 390-94.) Appellants state that "[v]irtual-ly none of the points raised in this document" were addressed. (Appellants' Br. at 7.)

In response, MISD argues that Appellants' claims are largely generalized observations often without reference to specific sup-porting evidence. Appellants' statements regarding transition services exemplify this. Appellants assert that the major issue in this case is whether K.C. was provided adequate transition services. Without reference to any specific aspect of the education provided to K.C. during the relevant period, Appellants declare that the IEPs developed for K.C. "show[] no coordinated activities and no results-oriented process." (Appellants' Br. at 21.)

Still in relation to transition services, Appellants assert that MISD "did not offer or provide [K.C.] the kind of programming she needed, but only what they had available." (*Id.*) This sort of statement shows that it is Appellants, not MISD, who are attempting to apply an incorrect standard to this case. The Fifth Circuit has consistently stated that an IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Houston Indep. Sch.*

*Dist.*, 200 F.3d at 347 (citing *Cypress-Fairbanks*, 118 F.3d at 247-48).

Finally, in regard to transition services, Appellants claim that the IEPs developed by MISD were insufficient to provide K.C. with certain skills in which she was especially deficient. Specifically, Appellants claim that the June 2007 IEP did not address K.C.'s needs in adult living objectives and daily living skills. Again, Appellants never discuss the contents of the June 2007 IEP or address specifically how it fails to address K.C.'s deficiencies in certain skill areas. In fact, Appellants never address why such skills must be covered by an IEP. And although the IDEA, and particularly the Department of Education regulations[3] interpreting it, require an IEP to impart functional skills to the child[4], Appellants never cite or discuss the relevant provisions in their opening brief. Regardless, as the following discussion demonstrates, the IEPs for the 2006-2007 and 2007-2008 school years provided extensively for the development of K.C.'s functional skills.

The Court concludes that a review of the record demonstrates K.C. was given several tests to assess her skills and performance

---

[3] Although not binding, the Secretary of Education's regulations are entitled to substantial deference. *See Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891-92 (1984) (citing *Blum v. Bacon*, 457 U.S. 132, 141 (1982) ("the interpretation of an agency charged with the administration of a statute is entitled to substantial deference.")).

[4] *See* 34 C.F.R. § 300.320(a)(1) & (2) (requiring an IEP to include a statement of a child's "functional performance" and "functional goals").

level.  In September 2006 K.C. was given the Campbell Interest and Skill Survey ("CISS").  This test is designed to assess the taker's occupational interests and skills and compare them with those of workers in a range of occupations.  (Rec. at 336.)  The taker's skills and interests are scaled and correlated to indicate to the school district what activities should be pursued or explored, what skills need development, and what activities should be avoided. (*Id.*)  The "interest" score indicates how appealing an activity is to the taker and the "skill" score indicates how confident the taker feels in performing an activity. (Rec. at 337.)  K.C.'s skill scores were highest in child development, fashion, and child care. (Rec. at 338.)  K.C.'s interest scores were also highest in these areas. (*Id.*)  K.C. also had a high interest score in the area of performing arts, but her skill score in this area was in the "very low" range. (*Id.*).

K.C. was also given a "Full and Individual Evaluation" ("FIE"). This evaluation entailed a review of various sources of information regarding K.C. by a multidisciplinary team of specified profession- als.  (Rec. at 316.)  Information reviewed in the FIE included K.C.'s school records, information provided by her parents, and a language survey.  (*Id.*)  K.C.'s physical condition, health, motor skills, sociological influences, emotional condition, behavior, intelligence, adaptive abilities, and academic performance were all taken into consideration as part of the FIE.  (Rec. at 316-21.)

The FIE also reveals that various other tests were given to K.C. to assess her abilities both before and during the limitations period. As part of the FIE, a Woodcock-Johnson III test of cognitive ability was administered. (Rec. at 1609.) This test measures an array of skills and abilities. (*Id.*) K.C. was also given a Woodcock-Johnson III test of achievement. (Rec. at 1611.) This test assesses the taker's functional level in various areas. (*Id.*) Additionally, a formal adaptive behavioral assessment was done to assess K.C.'s social and behavioral skills. (Rec. at 1610.)

On September 26, 2006, an ARD committee meeting was held and the results of the FIE and related testing were considered. (Rec. at 1657.) K.C.'s then present levels of performance in various areas were noted. (Rec. at 1657-58.) Based on her performance up to the time of the meeting, the ARD committee agreed upon English goals and objectives on the 6th grade level and math goals and objectives on the 5th grade level. (Rec. 1638-40.) Objectives related to the skills of time, task, and resource management were also established. (Rec. at 1641-46; Trans. at p.655, 669-70.) The ARD committee also developed an objective that K.C. develop her vocal performance skills to include memorization and sight reading through vocal instruction. (Rec. at 1646.) This involved K.C.'s participation in choir at Timberview and included one-on-one instruction with the Timberview choir teacher. (Trans. at 576-77.) K.C. was also placed in a "teen leadership" class to develop her

social and self-advocacy skills and to foster interaction with non-disabled peers.  (Rec. at 1652; Trans. at 732-734.)

Vocational opportunities were also provided to K.C.  As part of the CBVI program and in furtherance of her interest in music, K.C. was placed as a classroom aide in a music class in Erma Nash Elementary School.  (Trans. at 674.)  K.C. was provided a job coach who accompanied K.C. to the elementary school, assisted and prompted K.C. in the performance of her duties, and documented K.C.'s progress (Trans. at 674-76; Rec. 1892-1911.)  Later, in relation to her interest in fashion, K.C. worked at a Ross department store. (Trans. at 679-80.)  At Ross, K.C. took instructions from the store manager, and performed various tasks such as sorting and stocking. (Trans. at 679-80.)

Aside from the provision of a job coach, MISD provided K.C. with other accommodations and support services.  Due to her visual and spatial difficulties, K.C. was provided preferential seating and and type-written lesson notes in large font.  (Rec. at 1647.)  K.C. was provided with modified tests using multiple choice or oral responses.  (*Id.*)  To account for K.C.'s poor handwriting and difficulties with fine-motor skills she was provided a word processor and a calculator with large buttons.  (*Id.*)  In light of her mobility issues K.C. was assigned a peer partner for classes she took that were on the second floor of the school building to ensure she could make it out of the building in case of emergency.  (*Id.*)

22

K.C. also received simplified instructions supported by visual cues in relation to non-literal, abstract, and ambiguous concepts. (*Id.*)

In June 2007 another ARD committee meeting was held to schedule K.C.'s classes and develop her IEPs for the upcoming year. (Rec. at 809, 1696-1733.) Since the September 2006 ARD committee meeting, a music therapy evaluation had been performed on K.C. (Rec. at 1676-80.) Music therapy is the use by a board certified music therapist of music and music-related strategies to achieve nonmusical goals. (Rec. at 1676.) The evaluation states that in Texas public schools music therapy is available only "to those students who demonstrate that music therapy is a necessary intervention for them to benefit from special education." (Rec. at 1677.) The evaluation, conducted by a certified music therapist, concludes that music therapy is not necessary for K.C. to benefit from her education program. (Rec. at 1680.)

A functional vocational assessment ("FVA") was also conducted prior to the June 2007 ARD meeting. (Rec. at 1688-92.) In this assessment, K.C.'s performance and development in relation to her placements assisting in an elementary music class and at the Ross department store were reviewed. (*Id.*) According to the review, K.C. had some difficulty in carrying larger musical instruments and voiced various other complaints in relation to her time at the elementary school. (Rec. at 1688.) But K.C. achieved a good deal of success at Ross, demonstrating an ability to take instruction and

perform tasks, exhibiting an adequate attention span and appropriate social skills, and establishing an increasing degree of independence in performing her duties.  (Rec. at 1689-90.)

Both the FVA and the music-therapy evaluation were considered at the June 2007 ARD committee meeting.  (Rec. at 809, 1696.)  By this point Appellants had requested that K.C. be placed in BHMA. (Rec. at 1732.)  The school district declined to do so.  Instead, MISD concluded that it could provide K.C. with an adequate IEP. (Rec. at 1696-1733.)

Just as with the September 2006 meeting, the June 2007 ARD committee meeting took various evaluations and assessments of K.C. and her performance into consideration.  (Rec. at 809-811.)  The IEP developed in June 2007 sought to develop K.C.'s needs in living skills, functional academics, social skills, vocational training, and music instruction as part of a balanced curriculum.  For instance, the meeting summary recites that K.C. had shown progress in her mathematics skills and could manage a checking account and make purchases and that K.C. should begin learning how to budget her expenses.  (Rec. at 809.)  After consideration of input from Appellants, the math IEP was revised to include the use of a simulated debit card and further instruction on counting coins and bills. (Rec. at 810.)  The CBVI vocational program was continued with K.C. now working at a Braum's restaurant.  (Rec. at 810.)

K.C.'s parents, Appellants, contend that the IEPs developed in June 2007 were inadequate and notified MISD that they wanted a due-process hearing.  (Rec. at 1726-27, 1732.)  Again Appellants attack the IEPs with generalizations.  According to Appellants "a review of the [ARD] document shows that it either provides services that already failed K.C., or does not provide specific information as to the programs to be provided." (Appellants' Br. at 11.)  Appellants have the burden of pointing to specific instances in which MISD failed to provide K.C. with a FAPE rather than call upon the Court to review documents without guidance.

Appellants' specific complaints fail as well.  For instance, Appellants aver that a "CBVI" program was to be the "linchpin" of the IEP but there is no indication of what the program consists of, how it is implemented, or the goals and objectives involved. However, as the above discussion of the September 2006 IEPs demon-strates, the CBVI program provided K.C. with vocational opportuni-ties related to her skills and interests.  This program had proven successful in developing K.C.'s social skills and independence.

The June 2007 IEP proposed that K.C., in furtherance of her interest in music, continue to participate in choir and private music lessons through MISD.  Appellants claim choir had already proven inappropriate for K.C. because it involved participating in competitions.  The ARD committee, however, recommended that competi-tions be made voluntary for K.C.  (Rec. at 1731.)  K.C. would be

25

allowed to participate in non-competitive recitals. (*Id.*) Several other accommodations related to choir were made for K.C. including providing K.C. with an audio recording and printed lyrics for selections to be learned, organizing the choir staging plans to account for K.C.'s visual-spatial difficulties, allowing K.C. to respond orally to written assignments and tests, providing K.C. with a peer partner for rehearsals and performances, and providing Appellants with a weekly practice record. (Rec. at 1721.)

Appellants also complain that the choir course and lessons offered by MISD covered skills and abilities K.C. already had. But the documents from the June 2007 meeting show that K.C. had progressed in a variety of areas in which Appellants concede K.C. needed improvement. By all accounts K.C. needed to socialize with non-disabled peers and develop her social skills. According to K.C.'s choir teacher, K.C. had "formed positive peer relationships [and] participated in performances and a field trip with her nondisabled peers." (Rec. at 1731.) Moreover, K.C. had sung songs in different languages and, by incorporating certain hand signals into the lessons, the choir teacher was able to help K.C. progress in her ability to sight read.

The suggested IEP allegedly did not address K.C.'s present levels of performance in various vocational areas because, according to Appellants, adequate functional testing was never done. Although an occupational therapy evaluation (i.e., the FVA) was performed in

December 2006, Appellants argue that the evaluation was specific to the job site where K.C. worked at the time and, therefore, could not provide the basis for determining the appropriate vocational placements in the future. But as Appellants recognize, an FVA was done. And Appellants have not established why an evaluation of K.C.'s performance in light of her physical limitations during her participation in actual vocational placements could not be used to determine future vocation placements. That is, the school evaluated K.C.'s performance at two specific vocational placements and Appellants have not shown why such information could not be used in evaluating future placements.

Again, aside from responding to Appellants' specific complaints, the Court observes that the June 2007 IEPs included a series of practical goals designed to assist K.C.'s transition into life after high school. The IEPs proposed at the June 2007 meeting would have K.C. accomplish various practical tasks during her senior year including, among others, developing a weekly budget, balancing a checking account, selecting the proper attire for a given situation, developing conversation skills, scheduling, and preparing meals. (Rec. at 1705-19.) Documents from the June 2007 meeting also indicate that during her senior year K.C. would be educated, to the extent possible, in a general-education setting in order to provide her with the least restrictive learning environment. (Rec. at 1722.) K.C. would, however, be educated in a specialized environ-

ment to the extent required by her needs. (*Id.*) Again, as with the September 2006 IEPs, the June 2007 IEPs were individualized to K.C.'s skills, needs, and interests in order to provide K.C. with a beneficial education and transition services.

Of course, in hindsight, Appellants can point to specific actions taken by MISD that were less than ideal or resulted in less than maximum benefit to K.C. For instance, during the 2006-2007 school year, after she elected not to participate in choir, K.C. was enrolled in the Ready, Set, Teach program. This appears to have been an attempt to foster K.C.'s interest in and develop her skills regarding music and child care as disclosed by the CISS. (See Opinion[5] at 12 (citing Rec. at 1604.)) But as argued by Appellants and as found by the hearing officer, little, if any, appropriate support was given to K.C. in relation to the program. (Trans. at 190-91, 199-204, 673-74; Rec. at 1010.)

Such isolated shortcomings in the IEPs provided to K.C. are not sufficient to establish that such IEPs were not individualized programs based on various assessments of K.C. Indeed, after K.C. was withdrawn from the Ready, Set, Teach program another ARD committee meeting was held. (Trans. at 204.) It was at this meeting that the decision was made to allow K.C. to participate in choir at Timberview. (*Id.*) By all accounts K.C. was interested in music and

---

[5] Citations to the hearing officer's opinion will be indicated by "Opinion at __"

enjoyed her time at Timberview. (Appellants' Br. at 8 (acknowledg-
ing that K.C. "fairly enjoyed her participation" in the Timberview
choir.)  And even when Appellants' complaints are considered, the
foregoing discussion establishes that MISD undertook various methods
of evaluating K.C.'s skills, interests, and needs, and took these
factors into consideration in deriving a program that accommodated
K.C.'s needs, developed skill areas in which K.C. was weak, played
to skill areas in which K.C. was strong, and furthered her inter-
ests, all while providing her with practical vocational opportuni-
ties meant to assist her in her transition from MISD to post-second-
ary life.

      2.   Was the program administered in the least restric-
             tive environment?

    Little discussion is devoted to this factor in the briefs or
in the hearing officer's opinion.  The hearing officer observes that
the majority of K.C.'s classes were in the general-education setting
and that K.C. regularly interacted with her non-disabled peers.  The
officer further notes that Appellants presented no evidence that
K.C.'s IEPs were not administered in the least restrictive means.

    Appellants do not challenge the officer's factual conclusions.
Instead, in their reply, Appellants argue that children with dis-
abilities are only to be educated with children who are not disabled
"to the maximum extent appropriate."  (Appellants' Reply at 12
(quoting 34 C.F.R. § 300.114(a)(2)(i)).  Appellants contend that

MISD often failed to give K.C. appropriate accommodations or special services.

Aside from the fact that this argument is raised for the first time in Appellants' reply, it fails for two reasons. First, as discussed above, K.C. was provided with various accommodations and special services. Second, and perplexingly, although raised in the context of a factor that asks whether a disabled student was educated in the least restrictive environment possible, Appellants seem to argue that K.C.'s environment was not restrictive enough. Again, K.C. was provided with accommodation and support services. Moreover, K.C. was placed in general-education courses in furtherance of Appellants' desire that K.C. socialize with non-disabled peers. (Rec. at 1652, 1659; Trans. at 732-734.) Appellants have simply failed to point to evidence that MISD did not educate K.C. in the least restrictive environment possible.

3.   Were the services provided in a coordinated and collaborative manner by the key stakeholders?

The ARD committees that met and developed K.C.'s IEPs consisted of MISD personnel, including educational diagnosticians, speech therapists, counselors, vocational adjustment coordinators, educators, and special educators. (Rec. at 1585, 1664). An attorney as an advocate for the disabled child was also present. (*Id.*) As discussed in more detail above, a certified music therapist was used to perform an evaluation of whether music therapy was necessary for

K.C.  An occupational therapist reviewed K.C.'s participation in the
CBVI program and made recommendations to accommodate K.C.'s mobility
and other physical difficulties.  (Rec. at 846-51.)  Relatedly, a
physical therapist reviewed K.C.'s mobility limitations and con-
sulted with K.C. during the school year.  (Rec. at 1636.)  The
physical therapist spoke with K.C.'s math teacher about K.C.'s
mobility problems because math was the only class in which K.C.
participated on the second floor.  (Trans. at 398-99, 443; Rec. at
1673.)  An evacuation or "accessability plan" was developed (Rec.
at 1586-87) and a peer partner was also assigned to K.C. to assist
her in evacuating the building in case of emergency. (Rec. at 1647.)

    When K.C. decided to begin participating in choir once again
but did not wish to do so at MISD, MISD arranged for her to partici-
pate in choir at Timberview and provided transportation.   (Trans.
at 204, 574, 576, 578.)  K.C.'s musical instruction included pri-
vate, one-on-one lessons.  (Rec. at 1731; Trans. at 576-77.)  When
Appellants' voiced their desire that K.C.'s curriculum focus more
on developing her musical skills, MISD agreed to increase her music
lessons.  (Rec. at 1683-84, 1737-39; Trans. at 747-48.)  And until
the June 2007 ARD committee meeting, Appellants generally agreed
with the IEPs developed by MISD for K.C.  (Rec. at 1569, 1584,
1672.)  Indeed, the record indicates that Appellants attended ARD
committee meetings and offered information to be considered at such
meetings.  Thus, the record demonstrates that various professionals

and educators, with the input and assistance of K.C.'s parents, developed and implemented her IEPs.

> ### 4. Were positive academic and non-academic benefits demonstrated?

Appellants complain that, after the September 2006 FIE, K.C. was for the first time classified as a child with "mental retardation." (Rec. at 322.) Previously, K.C. had been categorized as "learning disabled." (Rec. at 665.) Appellants argue that even though K.C.'s condition was categorized as more severe, the FIE failed to take into account her scores from other evaluations. For instance, the FIE evaluator noted that K.C.'s scores on the WISC III IQ text in 2006 were consistent with tests she took at ages 9 and 11. (Rec. at 319.) Appellants insist that the actual data show K.C.'s scores had consistently dropped from a 76 in 1995 to a 50 in 2006. Also, Appellants assert that the FIE evaluator failed to explain the discrepancy between K.C.'s academic achievement scores and her IQ scores; the former being twenty points higher than the latter. (Rec. at 321.)

Appellants never point to evidence that a twenty-point discrepancy between K.C.'s academic scores and her IQ scores actually exists. Regardless, IQ scores as measured by the WISC III test are but one measure of a student's skills and performance. Various other assessments in the record demonstrate that K.C. was progressing, in some cases substantially. K.C.'s performance on state

developed standardized testing shows year-to-year improvement. K.C. was given the 6th grade Texas state developed alternative assessment ("SDAA") for reading in spring 2005 and answered 46% of the questions correctly. (Rec. at 1764.) The next spring K.C. took the released Texas Assessment of Knowledge and Skills ("TAKS") test and scored 52% correct. (Rec. at 1768.) Similar progress was shown in mathematics, with K.C. scoring 37% correct on an SDAA given in spring of 2005 and scoring 57% correct on a released TAKS test in spring 2006. (Rec. at 1765, 1768.) While the comparability of the SDAA and the TAKS is unclear both MISD and the hearing officer state that the TAKS is a more difficult test. (Opinion at 17; MISD's Brief at 25.) Appellants do not challenge this characterization.

K.C. showed progress in other standardized testing as well. A comparison of scores from Woodcock-Johnson III assessments administered to K.C. in Spring 2004 and Fall 2006 show K.C. maintained a consistent raw score. (Rec. at 292, 1611.) Due to the nature of the Woodcock-Johnson III assessment and the fact that a raw score is based on a comparison of the correct answers achieved nationwide by students at the same age level who took the same test, a consistent raw score demonstrates that K.C. was progressing at a pace similar to her age-equivalent peers. (Trans. at 523-31.) Further, ARD committee documents indicate K.C. was spelling at a third-grade level in 2005 but had improved to a sixth-grade level by 2006. (Compare Rec. at 672 with Rec. at 1634.)

K.C. also demonstrated non-academic progress.  As part of the CBVI program, K.C. worked at two different jobs.  While working at Ross, K.C.'s job coach observed that K.C. demonstrated various abilities and skills and, most importantly, established an increasing degree of independence in performing her duties.  (Rec. at 1689-90.)  A comparison of the results of the FIE performed on K.C. in Spring 2006 with the results of an FIE performed in Spring 2004 show that K.C.'s social skills progressed.  (Rec. at 292, 1610-11.) Progress in vocational and social areas is an important factor given that the IDEA seeks to instill independent living skills, *see* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa), and particularly in light of the fact that the thrust of Appellants' complaint is that MISD failed to provide practical, vocational training and transition services.  The Court concludes that the record demonstrates that K.C. progressed in both academic and non-academic areas.


        5.  BHMA as an Alternative

        Ultimately, Appellants seek reimbursement from MISD for the cost of K.C.'s attending BHMA.  Under the IDEA a local education agency that provides a child with a FAPE need not pay for the cost of educating that child at a private institution.  *See* 20 U.S.C. § (a)(10)(C)(i).  The above discussion demonstrates that Appellants have failed to establish that the IEPs during the period under review were insufficient under the *Cypress-Fairbanks* factors.

34

Consequently, Appellants have not shown that K.C. was not provided a FAPE at MISD and it follows that MISD is not responsible for paying for K.C.'s education at BHMA.


III.   Conclusion

In light of the foregoing, the Court concludes that Appellants have not established that K.C. was not provided a free appropriate public education as required by the IDEA.  Accordingly, their motion for judgment is DENIED and MISD's motion for judgment is GRANTED.


SIGNED March 26, 2009.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE